# UNITED STATES DISTRICT COURT

for the
Southern District of Ohio

FILED
RICHARD W. NAGEL
CLERK OF COURT
3/15/2023

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WEST. DIV. DAYTON

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* ) Case No. 3:23-mj-87
31 South Ardmore Avenue, Dayton, Ohio )
)
)

**APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the ____Southern____ District of ____Ohio____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC s. 841(a)(1) | possession with intent to distribute and to distribute controlled substances |

The application is based on these facts:

See Attached Affidavit of G. Tyler Orndorff

☑ Continued on the attached sheet.
☐ Delayed notice of ____ days (give exact ending date if more than 30 days: ____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*G. Tyler Orndorff*
*Applicant's signature*

G. Tyler Orndorff, TFO of the FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by reliable electronic means.

Date: March 15, 2023

City and state: Dayton, Ohio

Caroline H. Gentry
United States Magistrate Judge

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, G. Tyler Orndorff, a Task Force Officer ("TFO") with both the Federal Bureau of Investigation ("FBI") and City of Dayton Police Department ("DPD"), hereby make the following sworn statement under penalty of perjury:

## INTRODUCTION

1. I have been employed as a sworn law enforcement officer with the DPD for the past ten (10) years. I currently serve as a Detective with the DPD. I am also presently assigned as a TFO with the FBI Dayton Resident Office's Safe Streets Task Force (SSTF). As such, I am sworn under the Title 21, United States Code ("U.S.C."), Section 878, to serve as an officer of the United States duly authorized to conduct federal criminal investigations and execute federal arrests for violations of offenses set forth under Titles 18 and 21 of the U.S.C.

2. I am also a TFO with the DPD's Major Case/Drug Enforcement Unit. Since 2019, I have almost exclusively concentrated on the investigations of: narcotics, firearms, and gang-related criminal investigations. During my law enforcement career, I have attended numerous law enforcement training courses and seminars concerning the investigation of drug trafficking organizations. I have participated in many firearm-related arrests and executions of search warrants that have resulted in the seizure of large quantities of narcotics and firearms. I have additionally participated in many undercover -purchases of narcotics, and supervised the activities of police informants. I have also personally participated in investigating individuals suspected of possessing, manufacturing, distributing, and importing large quantities of various controlled substances. Based on my extensive law enforcement training and experience, I am familiar with the various manners and means drug traffickers and their criminal organizations typically employ within the United States.

## PURPOSE OF AFFIDAVIT

3. I make this affidavit in support of an application for a search warrant for the residence – namely:

   a. 31 South Ardmore Avenue, Dayton, Ohio, including all outbuildings, basements, garages, or sheds located on its curtilage, (hereinafter "**Location 1**"). **Location 1** is more fully described in Attachment A, which is incorporated herein by reference. As detailed below, I submit that probable cause presently exists to believe that evidence, contraband, fruits of crime, and other items illegally possessed, as well as property designed for use, intended for use, relating to violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute and distribution of controlled substances) exists can and will be found inside **Location 1.**

4. A specific list of items to be seized from **Location 1** are described in Attachment B, which is also incorporated herein by reference. I have not included every detail known to the present investigation, but only have set forth information deemed necessary to establish probable cause that the evidence associated with above-described drug trafficking offense is located at **Location 1**.

## PROBABLE CAUSE

5. On or about February 6, 2023, the Miami Valley Crime Stoppers Tip-Line received an anonymous complaint stating that drug dealing was occurring at 31 South Ardmore (i.e., **Location 1**). The tipster indicated that one of the individuals at the location was "Adrian Jackson" who, according to the tipster, had been arrested on a state F-5 drug possession charge the previous week. The complainant also reported that people carried firearms into **Location 1** and that there was continuous drug activity (i.e., day and night) at the residence. Finally, the tipster advised that a grey Infiniti with a temporary tag was associated with the illegal activity at **Location 1**. As detailed below, I was able to corroborate much of the information in this tip and therefore deem it

2

credible.

6. After reviewing this tip, I performed research concerning Adrian Jackson, including searching law enforcement databases and speaking with fellow law enforcement officers. Based on these inquiries, I learned that, during 2022 and 2023, Jackson had several encounters with police that resulted in the recovery of machines guns or drugs. In particular:

   a. On or about July 28, 2022, law enforcement observed saw Jackson enter a local business carrying in his waistband a black semi-automatic handgun fitted with an extended magazine. Jackson later left the business, entered an SUV, and drove away. Police soon stopped the car for a traffic violation and, during the ensuing encounter, saw in plain view inside of the SUV a Glock handgun with an extended magazine. Officers removed Jackson from the SUV and Mirandized him. After initially denying any knowledge of the Glock, Jackson admitted that it belonged to him. He explained that he was hesitant to claim the firearm because he knew that it was fitted with an illegal "switch" (i.e., a small device attached to the end of a Glock that converts the firearm from a semi-automatic to a fully automatic weapon or machine gun). Upon inspecting the Glock, officers confirmed that it, in fact, had a switch attached to it. The firearm was later test fired and confirmed as fully automatic. Based on my training and experience, as well as my familiarity with the drug trade in the Dayton, Ohio, area, I know that drug traffickers frequently carry with them fully-automatic firearms – namely, Glocks fitted with switches – as a means to protect themselves and their illegal products from rival drug traffickers.

   b. On or about December 30, 2022, law enforcement again encountered Jackson during a traffic stop in Dayton, Ohio. During this incident, police stopped Jackson for a traffic violation and, upon approaching his car, detected the odor of marijuana. Police asked Jackson to step from the car and, during an ensuing search of the vehicle, discovered within it two Glock firearms, marijuana packaged in baggies, a digital scale, and sandwich baggies. Based on my training and experience, I know that the how the drugs were packaged along with the presence

3

of the scale indicated that these controlled substances were intended for resale. Upon inspecting one of the Glock firearms, it was fitted with a switch, which, as noted above, is a common tool of drug traffickers. Police Mirandized Jackson who, although admitting ownership of the gun with the switch, denied that it was fully automatic. He also claimed that he was not selling the marijuana but only using it.

    c.  On or about January 14, 2023, officers stopped Jackson in Dayton, Ohio, while he was driving a gray Infiniti with temporary tag Q110289. (Notably, this vehicle matched the description of the car reported in the tip concerning **Location 1**.) Officers stopped the car for excessive window tint as well as an obstructed license plate. Upon approaching the car, police could detect the smell of marijuana emanating from it. Law enforcement searched the car and discovered within the front portion of the glove box a commercially packaged marijuana pouch with the phrase "X Pills" handwritten on it. Within the pouch, officers discovered two sandwich baggies, one containing 20 pressed blue-green pills and the other containing powder residue of the same color. Police discovered in the glove box a second commercially packaged marijuana pouch, which was unopened. Officers Mirandized Jackson who admitted that he owned the Infinity. He also claimed that the unopened marijuana pouch belonged to him but disclaimed any knowledge of the pills. Consistent with the information in the anonymous tip, Jackson was arrested for possession of drugs. Lab tests confirmed that the pills recovered from Jackson's Infinity contained methamphetamine.

    7.  On various dates during February 2023, I went to the area of **Location 1** and performed surveillance of the residence. I noticed that **Location 1** comprised the left side of a house that had been converted into two units – namely, **Location 1** (the first unit on the left side of the building the door to which was marked with a 31) and a second unit on the right side of the

building the door to which was marked with a 29 (i.e., 29 South Ardmore).[1] During this surveillance, I saw parked on the street in front of **Location 1** a grey Infinity bearing a plate cover that obstructed the view of its license plate. The Infinity matched the description from the anonymous tip as well as information from the traffic stop of Jackson during January 2023. On various occasions during that time, I also observed Jackson exit **Location 1** and enter the Infinity. I recognized Jackson from known photographs of him.

8. On or about February 7, 2023, I and other officers conducted a trash pull at **Location 1**. On that day, the grey Infiniti again was parked in front of **Location 1**. We recovered discarded trash from a receptacle that had been placed for collection in the alley behind **Location 1**. Upon inspecting the trash, I found within it discarded saran wrap that had been made into an oblong shape. Having worked narcotics investigations for multiple years, I know that the shape of the saran wrap was consistent with packaging commonly used to wrap pounds of methamphetamine.

9. On or about February 22, 2023, I conducted surveillance of **Location 1**, and the grey Infiniti again was parked in front of the residence. While there, I saw foot traffic/vehicle traffic consistent with **Location 1** operating as a place from which drug users purchase controlled substances. For instance, I saw several vehicles arrive and park in front of **Location 1**, their occupants then enter the front door of **Location 1** and remain inside for only a brief time before returning to their vehicles to depart the area. These observations are consistent with drug addicts arriving at the residence, entering it to acquire drugs, and then departing the area. Notably, the traffic also was consistent with information in the anonymous tip.

10. Given that my observations led me to believe that **Location 1** was operating as a

---

[1] This affidavit does not seek authorization to search 29 South Ardmore. It only seeks permission to search Location 1 (i.e., 31 South Ardmore).

5

drug house, I took additional steps to confirm my conclusion. On or about February 22, 2023, after observing a vehicle arrive at **Location 1**, its occupant briefly enter the residence, and then return to the vehicle, I followed the vehicle as it departed from **Location 1**. At my direction, a marked cruiser stopped the vehicle, and during the ensuing encounter, law enforcement discovered a baggie of pressed pills in the driver seat. The pills had inconsistent shapes, markings and colors which, from my training and experience, I know suggests that they were not legitimate prescription drugs but illegal controlled substances such as methamphetamine or fentanyl that had been pressed into pill form. I also know that methamphetamine and fentanyl pills have become a common distribution method for Dayton drug traffickers in an effort to disguise the contraband nature of the drugs. I spoke with the driver of the vehicle who claimed that pills were legitimate Valium. However, having previously observed real Valium, the pills did not match the prescription drug. Based on my training, experience, and observations at **Location 1**, I believe that the driver of the vehicle obtained these contraband pills from someone selling illegal drugs at **Location 1**. I submitted the pills to a laboratory but have not yet received the results of its analysis.

11. On or about March 7, 2023, I and other law enforcement conducted a trash pull at **Location 1**. We recovered discarded trash from a receptacle that had been placed for collection in the alley behind **Location 1**. Upon inspecting the trash:

a. I found two large bags, along with another small plastic baggie that contained a green leafy material that I immediately recognized to be marijuana. The packaging was consistent with wrappings for distribution quantities of marijuana that someone would then break down into smaller quantities for resale. I also located in the trash two empty prescription pill bottles that contained white powder residue within them. The residue field tested for the presence of fentanyl. Based on my training and experience, I believe that someone had placed pressed fentanyl pills inside of the prescription bottles to conceal the true nature of the contraband, but ultimately had sold the illegal pills to customers who arrived at **Location 1**.

b. Within the trash, I also located several possessory items for Adrian Jackson including mail addressed to him 4505 Owens Drive, Dayton, Ohio. I also located an Amazon package labeled with the address of **Location 1**.

12. Later in the day on March 7, 2023, I returned to the area of **Location 1** and performed surveillance. While there, I saw Jackson leave **Location 1** and enter a Dodge Challenger parked in front of the residence. I ran the license tag on the Challenger, and it returned to Jackson.

13. On or about March 13, 2023, I performed surveillance at **Location 1**. While there, I saw the Challenger parked in the street in front of the residence. I also saw Jackson leave **Location 1,** enter the driver seat of the Challenger, and drive away.

14. On or about March 14, 2023, I and other officers conducted a trash pull at **Location 1**. We recovered discarded trash from a receptacle that had been placed for collection in the alley behind **Location 1**. Upon inspecting the trash, I discovered within it two vacuum sealed packages, which drug dealers commonly use to store and to transport bulk amounts of drugs. One of the packages contained marijuana residue inside of it. The packaging was of a size to hold approximately one pound of marijuana. The second vacuum sealed bag appeared to be the top-half of another bag large enough to hold a pound of marijuana. These materials were consistent with drug trafficking activity occurring at **Location 1**.

15. Based on the foregoing, I believe that Jackson has used, and continues to actively use **Location 1** as place from which to sell, store, and process controlled substances, including methamphetamine, fentanyl, and marijuana, all of which are controlled substances. I also believe that, given Jackson's history of carrying firearms – including machines guns – the residence also likely contains firearms used to protect the drug operation housed there. Moreover, based on my training and experience, I know that drug traffickers frequently use cellular telephones to communicate with their customers, including to arrange drug deals, set prices for products, and

negotiate the sale of this contraband. I am familiar with the typical modus operandi employed by individual criminals and criminal organizations involved in the illicit distribution of controlled substances. As such, I know the following:

    a.    It is common practice for drug traffickers to conceal their criminal assets, their addresses, their telephone numbers and their telephone beeper/pager services through the use of third parties to avoid detection by law enforcement officials.

    b.    It is also common practice for drug traffickers to maintain residences or so-called "stash houses" to store and distribute drugs  Additionally they will commonly use "nominees" to obtain telephone services, utility services, and other miscellaneous services to conceal their true identity and criminal involvement.

    c.    It is also common practice for drug traffickers to place personal assets under the purported name/title of corporate entities in order to avoid detection of those assets by law enforcement officials.

    d.    It is also common practice for drug traffickers to maintain de facto dominion and control over said assets.

    e.    It is also common practice for drug traffickers possess large amounts of U.S. Currency in further the ongoing operation of their illicit drug business.

    f.    It is also common practice for drug traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other documents relating to the transportation and distribution of drugs. Drug traffickers commonly front (provide drugs on consignment) to their clients. The said books, records, receipts, notes, ledgers, and other documents are commonly maintained by drug traffickers in locations wherein they enjoy a ready access to them.

    g.    It is also common for drug traffickers to provide false information to law enforcement officials regarding their actual identity and personal residences.

  h. It is also common for drug traffickers to conceal from law enforcement their connection, control and/or ownership of vehicles, business assets, drug inventories, large amounts of currency, financial instruments, jewelry, and evidence of financial transactions relating to the acquisition and concealment of large sums of money that are tied to their drug trafficking activities.

  i. It is also common for drug traffickers to amass large proceeds from the sale of drugs, and then subsequently attempt to hide the true source of these profits, to wit: launder money. To accomplish this, drug traffickers typically utilize banks and/or other financial institutions to use cashier's checks, money drafts, and letters of credit. Other institutions commonly used include real estate firms and other legitimate business fronts.

  j. It is also common for drug traffickers to travel to facilitate their drug trafficking activities. Specifically, it is common for drug traffickers to transport, or cause to be transported, wholesale drug shipments from source cities to other locations where retail distribution will occur. Common methods of transportation include, but are not limited to, the use of commercial airlines, and rental/private automobiles and trucks.

  k. It is also common for drug traffickers to maintain books, ledgers and other documents which reflect names, addresses, and/or telephone numbers of their customers, criminal associates and conspirators. This information is often be stored in cellular phones in places such as the contacts list.

  l. It is also common for drug traffickers to take, or cause to be taken, photographs of themselves, their associates, their property and their drug product. These photographs have been known to be maintained and stored at their personal residences and/or businesses. These photographs have been known to be commonly be stored in personally owned cellular phones.

  m. It is also common for drug traffickers to commonly have in their possession, (that is on their person, at their residence, and/or their business) weapons, including firearms of

9

various types. Firearms are commonly used to protect and secure a drug trafficker's person and property which may include, but is not limited to, narcotics, jewelry, drug paraphernalia, books, records, and U.S. Currency.

        n.    It is also common for drug traffickers to maintain hidden compartments inside their residences and vehicles to secret drug trafficking related evidence, i.e., money, ledgers, drugs, etc. It additionally common for drug traffickers to bury evidence in containers such as shoe boxes, or secret evidence in personal safes and lock boxes.

        o.    It is also common for drug traffickers to refrain from openly discussing drug related topics and details on the telephone, i.e., specific drug quantities, prices, dates, and methods of delivery of drugs, etc. These types of detailed conversations are more typically engaged in during face-to-face private transactions. As such, most drug trafficking related telephone conversations tend to be very brief in duration and oftentimes use "coded" or "street" language". Such conversations are typically only understood by the traffickers themselves and designed to mislead or confuse non-participants of the conversations. Drug traffickers tend to make extensive use of cell phones and text messaging beepers/pagers to facilitate their communications. When calling a beeper or text messaging, drug traffickers commonly input the number that should be called and sometimes add additional instructions in the form of additional digits. The typical structure of a drug distribution organization consists of sources of supply, wholesale distributors, retail distributors, and the ultimate consumers. The wholesale distributors typically have more than one source of supply; likewise, the retail distributors often obtain drugs from more than one wholesale distributor. After receiving a quantity of drugs, the source of supply will often move the drugs to a location other than where he/she sells them to the wholesale distributors. The location of the source of supply's so-called "stash house" is generally a well-guarded secret known only to the source of supply and his/her closest associates. Most of the drugs, (as well as diluting and packaging materials and weighing equipment), are typically stored at the "stash house."

10

    p.  It is also common for drug traffickers to use rental vehicles for everyday travel. They will also typically maintain another vehicle(s), usually at an out of sight location, to otherwise facilitate their drug trafficking business. Drug traffickers commonly title their vehicles in the names of third parties.

    q.  It is also common for drug traffickers to have saved or deleted text messages, call logs, and other forms of electronic communication occurring over, stored in, or accessed on their cell phone(s).

    r.  Based upon my prior training and experience, I have repeatedly observed drug traffickers distribute a cell phone number to their drug customers, which is referred to as a "money phone." These money phones are primarily used to communicate with retail drug customers. These customers call the drug trafficker on that cell phone number to arrange a purchase of drugs as needed. The drug trafficker will often times simultaneously field calls from several customers, directing their customers to travel by car to a designated meet location. Once all the customers have arrived at the designated place, the drug trafficker will appear in his vehicle, quickly conduct hand to hand drug transactions with each customer, and then depart the scene.

## CONCLUSION

16. Based on the facts set forth in this Affidavit, I believe probable cause exists to conclude that evidence, contraband, fruits of crime, and other items illegally possessed, as well as property designed for use, intended for use, relating to violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute and distribution of controlled substances) exists can and will be found inside **Location 1.**

*G. Tyler Orndorff*
G. Tyler Orndorff
Task Force Officer
Federal Bureau of Investigation

Sworn and subscribed before me via telephone on this  15th  day of March 2023.

Caroline H. Gentry
United States Magistrate Judge

## ATTACHMENT A

**Location 1:** The place to be searched is 31 South Ardmore Avenue, Dayton, Ohio 45417, and the surrounding curtilage.  31 South Ardmore Avenue, Dayton, Ohio is the left half of a two-story cream-colored double. The front door to 31 South Ardmore Avenue is black in color with a black wrought iron security door. The numerals "31" are posted at eye level to the left of the front door. 31 South Ardmore Avenue is located on the west side of South Ardmore Avenue between West Third Street and Home Avenue. 31 South Ardmore Avenue, Dayton, Ohio 45417 is further depicted in the following photograph.



## ATTACHMENT B

## PROPERTY TO BE SEIZED

The items to be searched for and seized are evidence, contraband, fruits of crime, and other items illegally possessed, as well as property designed for use, intended for use, relating to violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute and distribution of controlled substances) including, but not limited to:

A. Log books, records, payment receipts, notes, and/or customer lists, ledgers, and other papers or electronic records relating to the transportation, ordering, purchasing, processing, and distribution of controlled substances.

B. Papers, tickets, notices, credit card receipts, travel schedules, travel receipts, passports, and/or records, and other items relating to domestic and foreign travel to obtain and distribute narcotics and narcotics proceeds, including, but not limited to airline receipts, vehicle rental receipts, credit card receipts, travel schedules, diaries, hotel receipts, truck logs, travel agency vouchers, notes, records of long distance telephone calls, e-mail and other correspondence.

C. Address and/or telephone books and papers reflecting names, e-mail and physical addresses and/or telephone numbers of individuals, partnerships, or corporations involved in drug trafficking and money laundering.

D. Financial records, financial statements, receipts, statements of accounts and related bank records, money, drafts, letters of credit, money orders and cashier's checks receipts, passbooks, bank checks, escrow documents, and other items evidencing the obtaining, secreting, transfer, and/or concealment of assets and the obtaining, secreting, transferring, concealment, and/or expenditure of money.

E. Electronic equipment such as surveillance video and related equipment, pagers, computers and cellular telephones, caller ID, telephone answering machines, police scanners and two-way radios, money counters.

F. United States currency, precious metals, coins, bullion, jewelry, and financial instruments, including, but not limited to stocks and bonds.

G. Photographs and/or photographic albums or video tapes and recordings of houses and other real estate, automobiles, and of other assets, persons, and/or controlled substances.

H. Indicia of occupancy, residency, and/or ownership of the premises and vehicles including, but not limited to utility and telephone bills, canceled envelopes, keys, deeds, tax bills, titles, and vehicle registrations.

I. Illegal drugs, including but not limited to marijuana, methamphetamine, fentanyl, and other materials, paraphernalia and/or equipment and tools used in the drug trade.

J.       Firearms and ammunition.